JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
SARVENAZ J. FAHIMI (SBN 226148)
sfahimi@cpmlegal.com
PIERCE H. STANLEY (SBN 352152)
pstanley@cpmlegal.com
VASTI S. MONTIEL (SBN 346409)
vmontiel@cpmlegal.com
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

**JOHN HOGRELL**, individually and on behalf of all others similarly situated,

Plaintiff,

v.

**GOPRO, INC.**,

Defendant.

Case No.:

**CLASS ACTION COMPLAINT**

**(1) Unjust Enrichment / Quasi-Contract**
**(2) Money Had and Received**
**(3) Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.***

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS


**Page**

**I. INTRODUCTION ..... 1**

A. The IEEPA Tariffs ..... 2

B. GoPro Publicly Assured Consumers That Its U.S. Prices Would Not Be Affected ..... 2

C. GoPro Quietly Raised Its U.S. Prices and Attributed the Increases to the Tariffs ..... 2

D. The Increases Fell on American Consumers Alone ..... 4

E. The Supreme Court Declared the IEEPA Tariffs Are Unlawful ..... 4

F. GoPro Sold Its Interest in the Refund Claim to Its Lender One Day Before the Supreme Court's Ruling ..... 4

G. GoPro Was Sold, and Every Constituency but Its Customers Are Made Whole ..... 5

H. The Result Is Unjust Enrichment ..... 6

**II. PARTIES ..... 7**

A. Plaintiff ..... 7

B. Defendant ..... 7

**III. JURISDICTION AND VENUE ..... 7**

**IV. FACTUAL ALLEGATIONS ..... 8**

A. GoPro's Business and the IEEPA Tariffs ..... 8

B. GoPro Publicly Assured the Consuming Public That U.S. Prices Would Not Be Materially Affected ..... 9

C. GoPro Quietly Raised United States Prices in April 2025 ..... 10

D. GoPro's CFO Admitted the Price Increases Were Motivated by, and Calibrated Against, the Tariffs ..... 10

E. The Pass-Through Fell on American Consumers Alone ..... 11

F. The Supreme Court Held the IEEPA Tariffs Are Unlawful ..... 12

G. The Government Returned the Tariffs to Importers, Not Consumers ..... 12

H. On the Eve of the Supreme Court's Ruling, GoPro Sold the Consumer-Funded Refund Claim to Its Lender ........ 12

I. The Refunds Arrived, and GoPro Consumers Received Nothing ........ 14

J. GoPro's Own Numbers Quantify the Consumer Overcharge ........ 14

K. GoPro's Financial Condition Makes Equitable Relief Necessary and Urgent ........ 15

L. The IEEPA Claim Was One Step in a Sequence of Balance-Sheet Transactions That Ended in GoPro's Sale ........ 16

M. GoPro's Challenged Conduct Was Conceived, Directed, and Executed in California ........ 18

**V. CLASS ACTION ALLEGATIONS ........ 19**

**VI. CLAIMS FOR RELIEF ........ 21**

FIRST CLAIM FOR RELIEF ........ 21
Unjust Enrichment / Restitution (Quasi-Contract)
(On Behalf of Plaintiff and the Nationwide Class)

SECOND CLAIM FOR RELIEF ........ 22
Money Had and Received
(On Behalf of Plaintiff and the Nationwide Class)

THIRD CLAIM FOR RELIEF ........ 23
Violation of the Unfair Competition Law
Cal. Bus. & Prof. Code §§ 17200, et seq.
(On Behalf of Plaintiff and the Nationwide Class)

**VII. PRAYER FOR RELIEF ........ 25**

**VIII. DEMAND FOR JURY TRIAL ........ 26**

Plaintiff John Hogrell individually and on behalf of all others similarly situated, upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, hereby alleges as follows:

## I. INTRODUCTION

1. This case is about a company that told the American public its prices would not go up because of tariffs, quietly raised those prices anyway, collected the increase from its customers for more than a year, and then on the eve of the Supreme Court decision that would invalidate the tariffs, sold its interest in the resulting tariff refund claim to a secured lender for its own balance-sheet benefit. Not one dollar has been returned to the consumers who actually paid prices inflated due to tariffs.

2. Plaintiff John Hogrell ("Plaintiff"), individually and on behalf of those similarly situated, brings this class action against Defendant GoPro, Inc. ("GoPro" or the "Company") to recover monies that GoPro extracted from American consumers as an offset for import tariffs that the United States Supreme Court has since declared unlawful, tariffs for which GoPro was due to be reimbursed, with interest, by the federal government but arranged instead for the refund of those tariff duties to flow to a lender to whom GoPro sold its interest while trying to improve the appearance of its pre-acquisition balance sheet, rather than channel those funds to consumers who funded the tariff payments in the first place.




***GoPro's Headquarters in San Mateo, California***

### A. The IEEPA Tariffs

3. In early 2025, President Trump invoked the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701, *et seq*. ("IEEPA"), to impose sweeping tariffs on imports from China and nearly every other United States trading partner. GoPro, whose action cameras, mounts, and accessories are manufactured overseas, principally in Thailand, China, and Mexico, was subject to those duties, and it responded by quietly inflating prices of its flagship products.

### B. GoPro Publicly Assured Consumers That Its U.S. Prices Would Not Be Affected

4. On February 3, 2025, one day before the first IEEPA tariffs took effect, GoPro issued a press release announcing that its "diversified supply chain mitigates the potential impact of U.S. tariffs" and stating affirmatively that the Company *did not expect U.S. consumer pricing* or gross margin to be materially affected by the recent tariff announcements.[1]

5. GoPro's Chief Financial Officer and Chief Operating Officer, Brian McGee ("McGee"), was quoted in the same release explaining that GoPro had "proactively moved" its U.S.-bound camera production outside of China, "which has significantly reduced the impact of tariffs."[2] That assurance was directed at the consuming public, and it was published on GoPro's investor relations page, syndicated through PR Newswire, and reported by consumer technology outlets.

### C. GoPro Quietly Raised Its U.S. Prices and Attributed the Increases to the Tariffs

6. In or about April 2025, within weeks of the April 2 IEEPA proclamation and roughly two months after telling consumers that pricing would not be materially affected, GoPro raised the United States list prices of its flagship products. The HERO13 Black increased from approximately $399 to $429, approximately 7.5 percent, and the entry-level HERO increased from approximately

---

[1] GoPro, Inc., Press Release, GoPro's Diversified Camera Supply Chain Minimizes Tariff Impact (Feb. 3, 2025), https://investor.gopro.com/press-releases/press-release-details/2025/GoPros-Diversified-Camera-Supply-Chain-Minimizes-Tariff-Impact/default.aspx.

[2] *Id.*

$199 to $219, approximately 10 percent.[3] GoPro made no announcement of the increases to consumers.

***The price of the GoPro HERO13 Black increased from approximately $399 to $429.***






***The price of the entry-level GoPro HERO increased from approximately $199 to $219.***

7. GoPro's own executives then confirmed to investors that the increases were a tariff pass-through. On GoPro's second quarter 2025 earnings call, CFO McGee stated that GoPro expected "the impact of tariffs on our cameras and accessories in 2025 to be approximately $18 million, up from $8 million due to tariff rates increasing from 10% to 20%," and that the Company expected "to offset approximately 50% of the full tariff impact by the modest product price moves we have already made."[4]

8. In its management commentary, GoPro told investors that it "expect[ed] to offset half of [its] expected tariff costs with modest price increases and continued supply chain

---

[3] Hillary K. Grigonis, *GoPro says it is exploring making some products in the US after quietly increasing the list price of popular cameras*, Digital Camera World (Aug. 20, 2025), https://www.digitalcameraworld.com/cameras/action-cameras/gopro-has-quietly-increased-the-price-of-its-action-cameras-in-the-us.

[4] GoPro, Inc., Q2 2025 Earnings Call (Aug. 2025) (remarks of Brian McGee, EVP, CFO and COO) (transcript on file with counsel).

diversification outside of China."[5] GoPro told its investors, in substance and in numbers, that the April 2025 price increases existed to recoup the tariffs.

**D. The Increases Fell on American Consumers Alone**

9. Although Mr. McGee characterized the price moves as taken "globally," contemporaneous reporting established that the increases were in substance United States increases. In both the United Kingdom and Australia, the HERO13 Black and the entry-level HERO remained at their original launch prices, while the price for those products simultaneously increased in the U.S.[6] The burden of the tariff pass-through was therefore borne by American purchasers.

**E. The Supreme Court Declared the IEEPA Tariffs Are Unlawful**

10. On February 20, 2026, the Supreme Court held in *Learning Resources, Inc. v. Trump,* 146 S. Ct. 628 (2026), that IEEPA does not authorize the President to impose tariffs. The tariffs that GoPro invoked to justify its price increases were therefore unlawful from the moment they were imposed.

11. Following that decision, the United States Court of International Trade ("CIT") ordered U.S. Customs and Border Protection ("CBP") to refund the unlawfully collected IEEPA duties, with interest. CBP implemented a mass refund mechanism, the Consolidated Administration and Processing of Entries ("CAPE") system, which began accepting refund declarations on April 20, 2026. Under federal customs law, those refunds flow exclusively to importers of record such as GoPro, not to the consumers who actually bore the tariffs' economic burden through GoPro's price increases.

**F. GoPro Sold Its Interest in the Refund Claim to Its Lender One Day Before the Supreme Court's Ruling**

12. On February 19, 2026, the day before the Supreme Court decided *Learning Resources*, GoPro entered into a Claim Sale and Purchase Agreement (the "IEEPA Agreement") with a lender under its 2025 Credit Agreement, pursuant to which GoPro transferred to that lender

[5] *Id.*

[6] Grigonis, *supra* note 3.

its rights and claims to refunds of tariffs previously paid under IEEPA, representing an aggregate claim amount of approximately $19.4 million.[7] As GoPro has since disclosed, "[a]s a result of the IEEPA Agreement, the Company will not have rights for any future proceeds from the transferred IEEPA Claim."

13. GoPro paid an aggregate of approximately $20.2 million in IEEPA duties.[8] By its own account, it recovered approximately half of that sum from American consumers through the April 2025 price increases, roughly $10 million. It then monetized the other side of the same transaction by selling the refund claim to its lender in exchange for credit accommodations under the 2025 Credit Agreement, an amendment to which was executed eight days later.

14. The refunds have since arrived. In the second quarter of 2026, Customs and Border Protection approved GoPro's submitted refund claims as part of the Phase 2 CAPE refunds, and GoPro recorded an $18.9 million reduction to cost of revenue. After June 30, 2026, GoPro received $17.9 million in refunds from CBP, including interest.[9]

15. Consumers have received nothing. GoPro has not refunded, credited, or otherwise returned to its customers any portion of the tariff-justified price increases it collected, has not committed to do so, and has structured the disposition of the refund proceeds so that they bypass consumers entirely.

**G. GoPro Was Sold, and Every Constituency but Its Customers Are Made Whole**

16. On September 1, 2026, it was reported that GoPro announced that it had entered into an Agreement and Plan of Merger with Action Acquisitions LLC and Starman Optical, Inc., in an all-cash transaction valued at approximately $285 million.[10] GoPro's stockholders will receive approximately $1.14 per share and will retain roughly ten percent of the combined company. GoPro

---

[7] GoPro, Inc., Quarterly Report (Form 10-Q) for the quarterly period ended June 30, 2026, at Note 1 (Summary of business and significant accounting policies — IEEPA Tariff Recovery) (filed Aug. 10, 2026) (the "Q2 2026 Form 10-Q").

[8] *Id.*

[9] *Id.*

[10] GoPro, Inc., Current Report (Form 8-K), Item 8.01 (Sept. 1, 2026) (announcing entry into an Agreement and Plan of Merger with Action Acquisitions LLC and Starman Optical, Inc.).

has announced that its approximately $92 million of outstanding debt will be repaid in full at closing, leaving the merged entity with a substantially debt-free balance sheet.[11]

17. The merger completes a distribution of value in which every constituency is accounted for except the one that funded the tariffs. GoPro's secured lenders, including the lender that holds the IEEPA Claim GoPro transferred to it in February 2026, are to be repaid in full in cash. GoPro's stockholders are to receive cash plus continuing equity. GoPro's customers, who paid the tariff surcharge that generated the refund now flowing to those lenders, will receive nothing. No part of the transaction sets aside a dollar for them.

18. GoPro's maneuver is the final step in a sequence in which a consumer-funded asset was removed from GoPro's balance sheet, pledged to satisfy secured debt, and then converted into cash for creditors and stockholders, without an accounting to the consumers who supplied the money in the first place.

**H. The Result Is Unjust Enrichment**

19. The result is classic unjust enrichment. GoPro charged its customers for a cost it represented the tariffs imposed. The tariffs were unlawful. The government has returned that cost with interest. GoPro has been made whole twice for a single unlawful exaction, once by its customers and once by the Treasury, and GoPro has directed the second recovery to its secured lender rather than to its consumers.

20. Other participants in the same supply chain have done the opposite. Shippers and customs brokers including FedEx and UPS, which acted as importers of record and received tariff refunds from the government, have begun passing those refunds through to the customers who originally paid the duties.[12] What separates GoPro from those companies is that GoPro has made clear it has no intention of returning anything to its customers.

---

[11] Prathik Jayaprakash, *GoPro to be acquired by Starman Optical in $285 million deal*, Reuters (Sept. 1, 2026), https://www.reuters.com/legal/transactional/gopro-be-acquired-by-starman-optical-285-million-deal-2026-09-01/.

[12] Mae Anderson, *A surprise credit after an overseas purchase: The tariff refunds now flowing through shippers*, Associated Press (Aug. 14, 2026), https://apnews.com/article/tariff-refund-shipping-retail-d4162f466eb83aa97e430a86221ad226.

21. Plaintiff brings this action on behalf of a Nationwide Class of purchasers of GoPro products during the period of the unlawful tariffs, seeking restitution, disgorgement, the imposition of a constructive trust over GoPro's IEEPA tariff refunds and their traceable proceeds to the extent of the amounts passed through to consumers, as well as declaratory judgment, public injunctive relief, damages, and all other available relief.

## II. PARTIES

### A. Plaintiff

22. Plaintiff John Hogrell resides in Derry, New Hampshire. Plaintiff is a citizen of New Hampshire. On or about July 30, 2025, Plaintiff purchased a GoPro HERO13 Black for approximately $418.99. The price Plaintiff paid reflected GoPro's April 2025 tariff-justified price increase, which GoPro set at its California headquarters and applied uniformly to its United States list prices nationwide, including in New Hampshire. Had GoPro not inflated its prices in the name of the unlawful IEEPA tariffs, Plaintiff would have paid less for the same product. Plaintiff has received no refund, credit, or other compensation from GoPro corresponding to the tariff component of the price Plaintiff paid.

### B. Defendant

23. Defendant GoPro, Inc. is a Delaware corporation with its global corporate headquarters and principal place of business at 3025 Clearview Way, San Mateo, California 94402. GoPro designs, markets, and sells action cameras, mounts, accessories, and subscription services, which it sells globally through its own website, through retailers, and through wholesale distributors. On information and belief, GoPro, Inc. is the importer of record for GoPro products sold in the United States, and it is the entity that remitted the IEEPA duties at issue to CBP.

## III. JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a putative class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than 100 putative class members; and minimal diversity exists because at least one member of the putative Nationwide Class is a

citizen of a state different from Defendant. Defendant is a citizen of Delaware, where it is incorporated, and of California, where it maintains its principal place of business. Members of the Nationwide Class are citizens of all fifty states.

25. This Court has personal jurisdiction over Defendant. GoPro maintains its global corporate headquarters and principal United States operations in this District, and the pricing decisions, public statements, and conduct alleged herein emanated from this District.

26. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant is headquartered in this District and a substantial part of the events giving rise to Plaintiff's claims, including the decision to impose and maintain the tariff-justified price increases, the February 3, 2025 public assurance regarding U.S. consumer pricing, the negotiation and execution of the IEEPA Agreement with GoPro's lender, and the operation of the GoPro.com storefront, occurred in this District.

27. Pursuant to Civil Local Rule 3-2(c) and (d), assignment to the San Francisco Division or the Oakland Division is proper because a substantial part of the events giving rise to the claims occurred in San Mateo County, where GoPro is headquartered.

## IV. <u>FACTUAL ALLEGATIONS</u>

### A. GoPro's Business and the IEEPA Tariffs

28. GoPro designs and sells action cameras and related mounts, accessories, and subscription services. GoPro's hardware products, including the HERO line of action cameras, the MAX 360 line, and the MISSION series, are manufactured overseas by third-party contract manufacturers and imported into the United States for sale to American consumers.

29. On February 1, 2025, President Trump invoked IEEPA to impose tariffs of 25 percent on imports from Canada and Mexico and 10 percent on imports from China, citing fentanyl trafficking. Those duties took effect on February 4, 2025.

30. On April 2, 2025, the administration invoked IEEPA again to impose a baseline 10 percent tariff on imports from nearly all United States trading partners, with substantially higher country-specific rates layered on top.

31. In total, CBP collected approximately $166 billion in IEEPA duties from more than 330,000 importers across more than 53 million entries.

32. The IEEPA tariffs applied to the countries in which GoPro's products are manufactured. Although GoPro had relocated its U.S.-bound camera production from China to Mexico in 2019 and subsequently to Thailand, those origins were themselves subject to IEEPA duties, and in October 2025 the United States and Thailand reached a framework agreement setting tariffs at 19 percent on a majority of goods imported into the United States.[13] GoPro has confirmed that it paid an aggregate of approximately $20.2 million in IEEPA duties.

**B. GoPro Publicly Assured the Consuming Public That U.S. Prices Would Not Be Materially Affected**

33. On February 3, 2025, the day before the first IEEPA duties took effect, GoPro issued a public press release titled "GoPro's Diversified Camera Supply Chain Minimizes Tariff Impact." The release announced that GoPro's diversified supply chain mitigated the potential impact of U.S. tariffs and stated that the Company did not expect U.S. consumer pricing or gross margin to be materially affected by the recent U.S. tariff announcements on inbound goods to be sold in the United States.[14]

34. That statement was made to the public, not merely to investors. It was disseminated through PR Newswire, published on GoPro's website, and reported in the consumer technology press, where it was understood, as GoPro intended it to be understood, as an assurance to American purchasers that GoPro's prices would hold.

35. GoPro never publicly retracted or corrected that assurance. It never announced to consumers that it had changed course. Instead, approximately two months later, it raised its United States prices without notice of any kind.

[13] Hillary K. Grigonis, *Are US camera prices about to change again? GoPro among the 1,000+ companies suing Trump over tariffs*, Digital Camera World (Jan. 8, 2026), https://www.digitalcameraworld.com/cameras/action-cameras/are-us-camera-prices-about-to-change-again-gopro-among-the-1-000-companies-suing-trump-over-tariffs.

[14] GoPro Feb. 3, 2025 Press Release, *supra* note 1.

### C. GoPro Quietly Raised United States Prices in April 2025

36. In or about April 2025, GoPro increased the United States list prices of its principal consumer products. The HERO13 Black, GoPro's flagship camera, rose from approximately $399 to $429. The entry-level HERO rose from approximately $199 to $219, an increase of approximately ten percent.[15]

37. GoPro issued no press release, no customer notice, and no disclosure of any kind to consumers regarding the increases. Consumers learned of them, if at all, only when technology publications began reporting on the price increases, comparing GoPro's live prices against archived captures of GoPro's own listings.

38. GoPro maintained the increased prices throughout the tariff period, February 4, 2025 through February 24, 2026, when CBP halted collection of all IEEPA duties (the "Class Period".) On information and belief, GoPro has maintained the increased prices to the present.

### D. GoPro's CFO Admitted the Price Increases Were Motivated by, and Calibrated Against, the Tariffs

39. On GoPro's second quarter 2025 earnings call, CFO and COO Brian McGee connected the price increases directly to the tariffs. Mr. McGee stated:

> "We expect the impact of tariffs on our cameras and accessories in 2025 to be approximately $18 million, up from $8 million due to tariff rates increasing from 10% to 20%. We expect to offset approximately 50% of the full tariff impact by the modest product price moves we have already made."[16]

40. GoPro's written management commentary similarly stated that the Company "expect[ed] to offset half of [its] expected tariff costs with modest price increases and continued supply chain diversification outside of China, while exploring the production of certain products in the U.S."[17]

---

[15] Grigonis, *supra* note 3.

[16] Q2 2025 Earnings Call Tr., *supra* note 4

[17] *Id.*

41. GoPro thus presented the tariffs and the April 2025 price increases to investors as offsetting entries in the same arithmetic. The price increases were not a response to demand, competition, input costs, or product improvement. By GoPro's admission, they existed to recoup the IEEPA duties.

42. GoPro reiterated the point at year end. Announcing fourth quarter and full year 2025 results on March 5, 2026, Mr. McGee stated that GoPro's "GAAP gross margin was flat despite absorbing $20 million in tariff expenses."[18]

43. Nowhere in these disclosures and nowhere in any consumer-facing communication did GoPro tell its United States customers that it had raised the retail prices they pay, that the increase was attributable to tariffs, or that it would retain any refund of those tariffs. GoPro reserved those admissions for its investors and its lenders.

**E. The Pass-Through Fell on American Consumers Alone**

44. Mr. McGee characterized GoPro's pricing actions as "modest product price moves … of less than 5% globally." That characterization understated the burden borne by American consumers in two respects. First, the United States list price increases on GoPro's principal products were approximately 7.5 to 10 percent, not less than 5 percent.

45. Second, the increases were not in fact global: contemporaneous reporting confirmed that in the United Kingdom and Australia, both the HERO13 Black and the HERO remained at their original launch prices.[19]

46. The tariff pass-through was therefore an American surcharge, imposed on American purchasers to recoup an American duty that the Supreme Court has since held the Executive had no power to impose.

[18] GoPro, Inc., Press Release, GoPro Announces Fourth Quarter and 2025 Results (Mar. 5, 2026) (remarks of Brian McGee); see also GoPro, Inc., Current Report (Form 8-K), Ex. 99.1 (Mar. 5, 2026).

[19] Grigonis, *supra* note 3.

**F. The Supreme Court Held the IEEPA Tariffs Are Unlawful**

47. On February 20, 2026, the Supreme Court held in *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628 (2026), that IEEPA does not authorize the imposition of tariffs, resolving the consolidated challenges that had proceeded through the CIT and the Federal Circuit.

48. The IEEPA tariffs were accordingly unlawful from inception. As the CIT subsequently held, all importers of record whose entries were subject to IEEPA duties are entitled to the benefit of the Supreme Court's decision.[20]

**G. The Government Returned the Tariffs to Importers, Not Consumers**

49. Following the Supreme Court's decision, the CIT ordered CBP to refund the unlawfully collected IEEPA duties, with interest. CBP developed the CAPE system within its Automated Commercial Environment to process refunds at mass scale. CAPE began accepting refund declarations on April 20, 2026, and refunds began issuing shortly thereafter.

50. Under federal customs law and the CIT's orders, IEEPA refunds are payable only to the importer of record, the entity that remitted the duties to CBP, or its designee. Consumers who bore the tariffs' economic burden through pass-through pricing have no mechanism to obtain any portion of the refunds from the government.

51. The refund regime thus returns the tariff monies to precisely the entities, like GoPro, that have already recouped those monies from their customers.

**H. On the Eve of the Supreme Court's Ruling, GoPro Sold the Consumer-Funded Refund Claim to Its Lender**

52. On August 4, 2025, GoPro entered into a credit agreement with Farallon Capital Management, L.L.C., as administrative and collateral agent, and Mateo Financing, LLC, as lender, providing for a second lien credit facility of up to $50.0 million (the "2025 Credit Agreement").[21]

---

[20] *Atmus Filtration, Inc. v. United States*, No. 26-01259 (Ct. Int'l Trade Mar. 4, 2026) (order); see also Amended Order, *Atmus Filtration, Inc. v. United States*, No. 26-01259 (Ct. Int'l Trade Mar. 27, 2026) (extending the refund directive to finally liquidated entries).

[21] Q2 2026 Form 10-Q, supra note 7, at Note 4 (Financing arrangements).

53. On December 30, 2025, GoPro filed a lawsuit before the CIT, along with hundreds of other companies, attempting to accelerate the payout of potential tariff refunds, a sign that GoPro knew that a potential refund may be imminent. GoPro was making moves to position itself to capitalize on a potential refund windfall, and that time came shortly thereafter.

54. On February 19, 2026, one day before the Supreme Court issued its decision in Learning Resources, GoPro entered into a Claim Sale and Purchase Agreement (the "IEEPA Agreement") with its lender, transferring to the lender GoPro's rights and claims to potential refunds of tariffs previously paid under IEEPA, representing an aggregate claim amount of approximately $19.4 million (the "IEEPA Claim").[22]

55. The IEEPA Agreement was entered into in connection with an amendment to the 2025 Credit Agreement executed eight days later, on February 27, 2026, which cured GoPro's then-existing covenant defaults.

56. GoPro has disclosed that, on the date of transfer, it "assigned no value to the IEEPA Claim" on its balance sheet "due to the significant uncertainty of any potential recovery prior to the U.S. Supreme Court's ruling in *Learning Resources, Inc. v. Trump*," and that "[a]s a result of the IEEPA Agreement, the Company will not have rights for any future proceeds from the transferred IEEPA Claim."[23]

57. GoPro subsequently accounted for the IEEPA Claim as a derivative liability, valuing it by reference to "observable transaction prices for identical IEEPA refund rights."[24] GoPro thus received present, quantifiable value (in the form of credit accommodations, covenant relief, and continued access to liquidity) in exchange for an asset that existed only because its customers had already reimbursed it for the underlying duties.

58. At no point did GoPro disclose to its customers that it had sold the refund claim or offer them any part of the value it received in exchange.

---

[22] *Id.* at Note 1.
[23] *Id.*
[24] *Id.* at Note 2 (Fair value measurements).

### I. The Refunds Arrived, and GoPro Consumers Received Nothing

59. In the second quarter of 2026, CBP approved certain of GoPro's submitted refund claims relating to previously paid IEEPA tariffs as part of the Phase 2 CAPE refunds. GoPro recorded an $18.9 million reduction to cost of revenue and a corresponding increase to other current assets for the approved claims.[25]

60. After June 30, 2026, GoPro received $17.9 million in refunds from CBP, which also included interest.[26] Pursuant to the IEEPA Agreement, GoPro has recorded a liability for those amounts and will remit the proceeds to its lender.

61. GoPro has not refunded, credited, or otherwise returned to its customers any portion of these amounts or of the tariff-justified price increases collected during the Class Period. It has not committed to pass through any portion of the refunds to its customers. It has maintained the elevated prices after the tariffs were invalidated.

62. As a direct result, GoPro has been (and absent relief will continue to be) enriched twice over at its customers' expense: once by the tariff-justified overcharges collected from Plaintiff and the Class, and again by the government's refund, with interest, of the very duties those overcharges were represented to cover.

### J. GoPro's Own Numbers Quantify the Consumer Overcharge

63. GoPro's own public filings quantify how much money it took from consumers. GoPro has disclosed that it paid an aggregate of approximately $20.2 million in IEEPA duties, and its IEEPA Claim represented an aggregate claim amount of approximately $19.4 million.

64. GoPro told investors that it expected to offset approximately 50 percent of the full tariff impact through the April 2025 price increases. Applied to GoPro's own figures, that admission establishes that GoPro extracted on the order of $10 million from purchasers through tariff-justified price increases — an amount that, together with the interest GoPro has received on the refunded duties, the declaratory and injunctive relief sought, and the value GoPro obtained in exchange for the IEEPA Claim, places the amount in controversy well in excess of $5,000,000.

---

[25] *Id.* at Note 1.
[26] *Id.*

65. Because the increases were concentrated on United States list prices while overseas prices held constant, the true pass-through borne by American purchasers is greater than a straight 50 percent allocation would suggest. The precise figure is a matter of proof, and GoPro's own records — its per-SKU pricing history, its entry-level customs data, and its internal margin bridges — will establish it.

66. GoPro reported 2025 revenue of approximately $652 million.[27] A substantial portion of that revenue was generated by United States consumer sales of products bearing the April 2025 price increases.

**K. GoPro’s Financial Condition Makes Equitable Relief Necessary and Urgent**

67. GoPro has disclosed that there is substantial doubt about its ability to continue as a going concern, and that this doubt has not been alleviated. As of June 30, 2026, GoPro reported cash and cash equivalents of $27.3 million, a stockholders' deficit of $32.7 million, an accumulated deficit of $906.9 million, and a net loss of $131.8 million for the first six months of 2026.[28]

68. GoPro has further disclosed that, without additional financing or a strategic transaction, it "may be required to significantly reduce, restructure, cease operations, or seek protection under the Federal bankruptcy laws."[29] In May 2026, GoPro's Board of Directors authorized a process to evaluate a potential sale of the Company and other strategic alternatives.

69. These circumstances make the equitable relief Plaintiff seeks both necessary and urgent. The IEEPA refund proceeds are a specific, identifiable, and traceable fund that exists only because Plaintiff and the Class reimbursed GoPro for the underlying duties.

70. Absent the imposition of a constructive trust and an equitable lien, that fund will be dissipated to GoPro's secured lender and general creditors, and the consumers who supplied it will recover nothing. Damages at law are inadequate to reach a fund that is presently in transit.

---

[27] GoPro, Inc., *GoPro Announces Fourth Quarter and 2025 Results*, *supra* note 18.

[28] GoPro, Inc., Q2 2026 Form 10-Q, *supra* note **7**, at Note 1 (Liquidity and Going Concern), Condensed Consolidated Balance Sheets, and Condensed Consolidated Statements of Operations.

[29] *Id.*

**L. The IEEPA Claim Was One Step in a Sequence of Balance-Sheet Transactions That Ended in GoPro's Sale**

71. Beginning in 2025, GoPro undertook a series of transactions directed at its liquidity, its covenant compliance, and the composition of its balance sheet. Each of those transactions converted an asset or an expectancy into present financing value for GoPro and its lenders. Taken together, they culminated in the sale of the Company.

72. On August 4, 2025, GoPro entered into the 2025 Credit Agreement, a second lien facility of up to $50 million with Mateo Financing, LLC as lender and Farallon Capital Management, L.L.C. as agent. On February 19, 2026, GoPro sold the IEEPA Claim to that lender. On February 27, 2026, GoPro amended the 2025 Credit Agreement, curing the covenant defaults then outstanding, and issued Convertible Debentures.

73. In April 2026, GoPro announced a restructuring, reducing its global workforce by approximately 23 percent. In May 2026, GoPro's Board of Directors authorized a process to evaluate a potential sale of the Company and other strategic alternatives, and GoPro retained outside advisors. On July 9, 2026, GoPro obtained waivers of further covenant defaults and entered into a fee letter under which it agreed that it would, within 180 days, "consummate a refinancing, sale or other transaction" causing all amounts outstanding under its 2021 Credit Agreement to be paid in full.[30]

74. On September 1, 2026, within that 180-day window, GoPro announced that it had entered into an Agreement and Plan of Merger with Action Acquisitions LLC, as parent, and Starman Optical, Inc., as a merger sub, pursuant to which Starman Optical will merge with and into GoPro, with GoPro surviving as a subsidiary of Action Acquisitions LLC.[31]

75. The transaction is valued at approximately $285 million, representing an aggregate cash payment to GoPro stockholders of approximately $1.14 per share, a premium of approximately 29.5 percent to the prior close, together with retention by existing stockholders of approximately ten percent of the combined company. The transaction has been approved by both boards and is

---

[30] *Id.* at Note 4 (Financing arrangements).

[31] Sept. 1, 2026 Form 8-K, *supra* note 10.

expected to close by year-end 2026, subject to regulatory approvals and approval by GoPro's stockholders.[32]

76. GoPro has publicly described the transaction as one that will "maximize the value of GoPro's IP and growth potential" by "recapitalizing the company, strengthening its balance sheet, investing in growth and onshoring the manufacturing" of its products.[33] GoPro has further announced that its approximately $92 million of outstanding debt will be repaid in full upon closing, leaving the merged entity substantially debt-free.[34]

77. The significance of these facts to this action is not that the merger is improper. It is that the merger sets, and makes final, a distribution of the value generated by the unlawful tariffs in which the consumers who paid that value receive nothing.

78. First, the IEEPA Claim is no longer an asset of GoPro. GoPro's property interest in the refund was transferred. Having been transferred in February 2026, it cannot be reached in the ordinary course as property of the surviving corporation. On information and belief, the proceeds of that claim, the $18.9 million in CBP-approved refunds and the $17.9 million already received with interest, are committed to a secured lender whose indebtedness is scheduled to be repaid in full in cash at closing. The consumer-funded refund will therefore have been converted, in its entirety, into the satisfaction of secured debt.

79. Second, the merger consideration itself represents a distribution of value to equity. GoPro's stockholders are to receive approximately $285 million in cash and a continuing ten percent interest in the combined enterprise, while the restitutionary claims of the consumers who overpaid during the Class Period remain wholly unsatisfied and unprovided for.

80. Third, GoPro's disclosed going-concern doubt and its stated exposure to bankruptcy make plain that, absent the merger, there would be no source of recovery for Plaintiff and the Class at all, that GoPro never intended to pay back the refund to customers in the first place. The merger does not cure that problem for consumers; it resolves it for lenders and stockholders alone.

---

[32] Reuters, *supra* note 11.
[33] GoPro, Inc., Press Release (Sept. 1, 2026) (Form 8-K, Ex. 99.1).
[34] Reuters, *supra* note 11.

81. Fourth, the transaction will alter GoPro’s corporate structure, its ownership, and the location and control of its assets before this action can be resolved on the merits. Plaintiff therefore seek a constructive trust and equitable lien that attaches now to the IEEPA refund proceeds and all traceable substitutes and that binds GoPro, the surviving corporation, and their successors and assigns.

82. On information and belief, GoPro’s disposition of the IEEPA Claim in February 2026, assigning to it no balance-sheet value on the eve of a Supreme Court decision that GoPro's own protective litigation before the CIT was designed to capitalize upon was undertaken to obtain immediate financing and covenant relief at a time when GoPro’s continued operation depended on both, and was one of the steps by which GoPro made itself marketable to potential acquirers.

83. Plaintiff is entitled to discovery into the negotiation, valuation, and consideration for that transfer, and into whether any portion of the merger consideration or of the sums applied to repay GoPro's secured debt is traceable to the tariff amounts Plaintiff and the Class paid.

**M. GoPro’s Challenged Conduct Was Conceived, Directed, and Executed in California**

84. Every material decision and act alleged in this Complaint was made, directed, or carried out by GoPro in California. GoPro is headquartered in San Mateo, California. On information and belief, its senior executives, including its Chief Executive Officer and Mr. McGee, its Chief Financial Officer and Chief Operating Officer, direct GoPro’s pricing, marketing, investor communications, and financing from that headquarters.

85. On information and belief, the decision to raise the United States list prices of GoPro’s products in April 2025, the amount of each increase, and the decision to maintain the increased prices after the IEEPA tariffs were declared unlawful were made by GoPro executives at its San Mateo headquarters. GoPro applied those increases uniformly to its United States list prices, so that every Class member, in every state, paid the same increase.

86. On information and belief, GoPro’s February 3, 2025 press release assuring the public that United States consumer pricing would not be materially affected by the tariffs was

drafted, approved, and issued from GoPro's San Mateo headquarters. The statements on GoPro's earnings calls and in its management commentary attributing the price increases to the tariffs were likewise made by GoPro executives on behalf of the California-headquartered Company.

87. GoPro sells directly to consumers throughout the United States through, which, on information and belief, it operates and controls from California. GoPro also sets from California the United States list prices at which its products are offered by third-party retailers nationwide, including in New Hampshire.

88. On information and belief, GoPro negotiated, approved, and executed the IEEPA Agreement, the February 27, 2026 amendment to the 2025 Credit Agreement, and the Agreement and Plan of Merger through officers and directors acting at its San Mateo headquarters. GoPro's decision to direct the IEEPA refund proceeds to its lender, rather than to the customers who funded the underlying duties, was made in California.

89. The injury to Plaintiff and to every Class member, wherever located, thus arises from a single course of conduct conceived, directed, and executed in California. California has a substantial interest in regulating the conduct of corporations headquartered within its borders, and in preventing California businesses from retaining the proceeds of unfair and deceptive practices directed from the State. California's contacts with the claims of each Class member are significant, and the application of California law to those claims is neither arbitrary nor unfair.

## V. CLASS ACTION ALLEGATIONS

90. Plaintiff brings this action individually and on behalf of the following proposed class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3):

91. **The Nationwide Class:** All persons in the United States who, between February 4, 2025 and February 24, 2026, purchased for personal, family, or household use a GoPro-branded product whose United States retail price was increased on or after February 4, 2025.

92. Excluded from the Class is Defendant, its officers, directors, and employees; their parents, subsidiaries, and affiliates; any judicial officer assigned to this matter and his or her immediate family and staff; and persons who purchased for resale.

93. **Numerosity.** The Class comprises at least hundreds of thousands of purchasers, dispersed throughout the United States. GoPro reported 2025 revenue of approximately $652 million, a substantial portion of which was generated by United States consumer sales of products bearing the tariff-adjusted price increases. Joinder of all members is impracticable.

94. **Commonality.** Common questions of law and fact predominate over questions affecting only individual members, including: (a) whether GoPro raised United States retail prices in response to the IEEPA tariffs; (b) the amount by which those increases exceeded prices that would otherwise have prevailed; (c) whether the IEEPA tariffs were unlawful (a question the Supreme Court has answered); (d) whether GoPro has sought, received, or transferred IEEPA refunds and their proceeds; (e) whether GoPro's February 3, 2025 public statement regarding United States consumer pricing was likely to deceive reasonable consumers; (f) whether GoPro’s retention of the pass-through overcharges and its disposition of the refund proceeds constitute unfair or fraudulent business practices under the UCL and unjust enrichment; (g) whether California law governs the claims of all Class members, given that GoPro’s challenged conduct was conceived, directed, and executed in California; and (h) the appropriate measure and form of class-wide restitution, including the propriety of a constructive trust.

95. **Typicality.** Plaintiff's claims are typical of the Class Plaintiff purchased a GoPro product at a price bearing the uniform increase and suffered the same injury from the same course of conduct as every other member.

96. **Adequacy.** Plaintiff has no interests antagonistic to the Class and has retained counsel experienced in complex consumer class action litigation with the resources to prosecute this action vigorously.

97. **Rule 23(b)(3) Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The tariff component of any individual purchase is modest, typically between several dollars and several tens of dollars, making individual actions economically irrational, while GoPro’s aggregate retention is substantial. Class treatment

presents no unusual manageability difficulties: the price increases were uniform and applied at the SKU level, and GoPro's own records identify its per-product pricing history and its direct customers.

98. **Rule 23(b)(2).** GoPro has acted or refused to act on grounds that apply generally to the Class, maintaining the tariff-justified prices, transferring the refund claim to its lender, and refusing to establish any mechanism to return the tariff component or refund proceeds, such that final injunctive and corresponding declaratory relief is appropriate respecting the Class as a whole.

99. **Choice of Law.** California law governs the claims of Plaintiff and every member of the Nationwide Class. As alleged in Section IV.M, GoPro's challenged conduct, including its pricing decisions, its public representations regarding the effect of the tariffs on United States consumer pricing, and its transfer of the IEEPA Claim to its lender, was conceived, directed, and executed at its headquarters in San Mateo, California. California's interest in regulating that conduct is paramount, and no other state has a greater interest in applying its law to the claims asserted here. Application of California law to the Nationwide Class therefore comports with due process and with California's choice-of-law rules.

100. Plaintiff reserves the right to modify the class definition, and to propose subclasses, including subclasses of purchasers in particular states or groups of states, as discovery and further investigation warrant.

## VI. <u>CLAIMS FOR RELIEF</u>

### FIRST CLAIM FOR RELIEF

### Unjust Enrichment / Restitution (Quasi-Contract)

### (On Behalf of Plaintiff and the Nationwide Class)

101. Plaintiff re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

102. Plaintiff and Class members conferred a benefit on GoPro by paying retail prices that embedded the pass-through of the IEEPA tariffs. GoPro received and retained that benefit. The tariffs having been declared unlawful, and the underlying duties having been refunded with interest. GoPro's retention of the consumer pass-through, while directing the government refund to its

secured lender, is unjust. GoPro would be made whole twice for a single unlawful exaction, at the sole expense of the consumers who funded it.

103. Under California law, which governs the claims of Plaintiff and every Class member for the reasons alleged in Section IV.M, a claim in quasi-contract for restitution lies to recover benefits unjustly retained. No enforceable contract term between GoPro and its customers addresses the disposition of tariff refunds, and no adequate remedy at law exists for the reasons alleged above.

104. Plaintiff and the Class are entitled to restitution and disgorgement of the tariff component of all Class Period purchases, and to the imposition of a constructive trust over all IEEPA refund proceeds received by, payable to, or transferred by GoPro, including the $18.9 million in approved refund claims and the $17.9 million in refunds received from CBP, the interest paid thereon, and the consideration GoPro received in exchange for the IEEPA Claim (to the extent of the amounts passed through to the Class).

**SECOND CLAIM FOR RELIEF**

**Money Had and Received**

**(On Behalf of Plaintiff and the Nationwide Class)**

105. Plaintiff re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

106. GoPro is indebted to Plaintiff and the Class in a sum certain or capable of ascertainment, the tariff component of the prices paid during the Class Period, an amount GoPro itself has quantified in its financial disclosures, for money had and received by GoPro for the use and benefit of Plaintiff and the Class.

107. In equity and good conscience, GoPro should not be permitted to retain those monies, which correspond to duties that were unlawfully exacted and that the government has returned to GoPro with interest.

108. GoPro has failed and refused to return any portion of those monies.

**THIRD CLAIM FOR RELIEF**

**Violation of the Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200, et seq.**

**(On Behalf of Plaintiff and the Nationwide Class)**

109. Plaintiff re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

110. GoPro's conduct as alleged constitutes unfair and fraudulent business acts and practices within the meaning of Business and Professions Code section 17200.

111. The UCL applies to the claims of Plaintiff and every member of the Nationwide Class, including those who, like Plaintiff, reside outside California. As alleged in Section IV. M, the unfair and fraudulent business acts and practices at issue were conceived, directed, and carried out by GoPro at its headquarters in San Mateo, California, and the representations, pricing decisions, and disposition of the IEEPA refund proceeds challenged here emanated from California.

112. **Unfair prong.** GoPro's conduct is unfair under any of the tests applied in California courts. GoPro (a) publicly assured consumers that its United States pricing would not be materially affected by the tariffs; (b) then quietly raised United States prices to pass through the cost of those tariffs; (c) maintained those prices after the tariffs were held unlawful; and (d) transferred the resulting refund claim to its secured lender for its own financing benefit, with no mechanism to return any portion to the customers who funded it.

113. The harm to consumers from this double recovery is substantial, is not outweighed by any countervailing benefit to consumers or competition and is not one consumers could reasonably have avoided. The increases were unannounced, the tariff component was not itemized, and consumers had no ability to know that the prices they paid embedded a government exaction that would later be refunded and assigned away.

114. The conduct likewise offends the legislatively declared policies underlying California's consumer protection statutes and the customs refund regime, which exists to disgorge unlawful exactions, not to confer windfalls.

115. **Fraudulent prong.** GoPro’s course of conduct was likely to deceive reasonable consumers. GoPro affirmatively represented on February 3, 2025 that it did not expect United States consumer pricing to be materially affected by the tariffs and then raised United States prices by approximately 7.5 to 10 percent without notice or correction. GoPro further omitted, in every consumer-facing communication, that the increased prices embedded a purported tariff cost, that the tariffs were subject to pending legal challenge, and that GoPro would retain or assign any subsequent refund. Reasonable consumers were likely to believe (and did believe) that the prices they paid reflected a bona fide, lawful cost of the goods rather than a recoverable exaction GoPro would reclaim for itself.

116. As a direct and proximate result, Plaintiff and Class members suffered injury in fact and lost money or property. Each paid more for GoPro products than they would have paid absent the tariff-justified increases. Plaintiff and the Class are entitled to restitution of the tariff component of the prices they paid, in an amount to be proven at trial, including by reference to GoPro's own quantifications of its tariff costs and pricing actions.

117. Plaintiff and the Class are further entitled to injunctive relief, including public injunctive relief, requiring GoPro to (a) cease retaining or transferring IEEPA refund proceeds attributable to amounts passed through to consumers; (b) establish a mechanism to return such amounts; and (c) disclose to the consuming public the tariff component embedded in its Class Period prices. This request for public injunctive relief benefits the general public of California, not merely the parties.

118. Plaintiff lacks an adequate remedy at law with respect to the restitutionary and injunctive relief sought under this cause of action. The tariff refunds at issue are a specific, traceable fund that has flowed from CBP to GoPro and is contractually committed to GoPro’s lender. Equitable remedies, including restitution, disgorgement, and a constructive trust or equitable lien over that fund and its traceable proceeds, can restore those specific monies to the consumers who supplied them.

119. Damages at law would not reach GoPro's ongoing and future receipt, retention, and transfer of refund proceeds. GoPro's disclosed going-concern doubt and stated exposure to bankruptcy make a purely legal remedy illusory, and the pending merger, under which GoPro's secured debt is to be repaid in full in cash and its stockholders are to receive approximately $285 million—while Plaintiff and the Class receive nothing—will, absent equitable intervention, place the consumer-funded refund permanently beyond reach.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment as follows:

1. Certifying the Nationwide Class under Rule 23(a), (b)(2), and (b)(3), appointing Plaintiff as class representative, and appointing Cotchett, Pitre & McCarthy, LLP as class counsel;
2. Entering a declaratory judgment that GoPro's retention of the tariff-justified price increases, and its transfer and retention of IEEPA tariff refund proceeds attributable to amounts passed through to consumers, constitute ill-gotten gains that must be returned to its customers;
3. Awarding restitution and disgorgement of all amounts by which Defendant was unjustly enriched, including the tariff component of all Class Period purchases;
4. Imposing a constructive trust upon, and/or an equitable lien against, all IEEPA tariff refund proceeds (including interest) received by, payable to, or transferred by Defendant, and all traceable proceeds and substitutes therefor, including the consideration Defendant received in exchange for the IEEPA Claim, to the extent of amounts passed through to the Class, and enjoining dissipation of such proceeds pending judgment;
5. Declaring that the constructive trust and equitable lien sought herein bind Defendant, the corporation surviving the merger contemplated by the Agreement and Plan of

Merger announced September 1, 2026, and their respective successors, assigns, and transferees with notice;

6. Enjoining Defendant from transferring, distributing, or otherwise dissipating IEEPA tariff refund proceeds and their traceable substitutes, including in connection with the repayment of secured indebtedness or the payment of merger consideration, to the extent of the amounts passed through to the Class, pending final judgment;

7. Granting public injunctive relief under the UCL as alleged herein;

8. Awarding pre-judgment and post-judgment interest at the maximum lawful rate;

9. Awarding attorneys' fees and costs, including under Code of Civil Procedure section 1021.5; and

10. Granting such other and further relief as the Court deems just and proper.

Date: October 9, 2026

**COTCHETT PITRE & MCCARTHY LLP**

By: */s/ Joseph W. Cotchett*
JOSEPH W. COTCHETT
SARVENAZ J. FAHIMI
PIERCE H. STANLEY
VASTI S. MONTIEL

*Attorneys for Plaintiffs and the Proposed Class*

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury of all issues so triable.

Date: October 9, 2026

**COTCHETT PITRE & MCCARTHY LLP**

By: */s/ Joseph W. Cotchett*
JOSEPH W. COTCHETT
SARVENAZ J. FAHIMI
PIERCE H. STANLEY
VASTI S. MONTIEL

*Attorneys for Plaintiffs and the Proposed Class*